## GOTTHELF v. STRANAHAN.

*(City Court of Brooklyn, General Term.   May 27, 1892.)*

**1. SPECIFIC PERFORMANCE—SALE OF LANDS—INTERVENTION OF INCUMBRANCES.**

The date fixed for the execution of a conveyance of city lots by the vendor with covenants against incumbrances (February 9, 1891) was postponed a number of times at the instance of the vendor, that he might remove "squatters." On May 4th he tendered a conveyance with the required covenants as of February 9, 1891. In the mean while an assessment for improvements was made against the lots. The vendor knew of the probability that the assessment would be made, and by his remonstrance might have defeated it. He might, also, by prompt proceedings, have removed the squatters, and completed the contract before the assessment was made. *Held,* that the vendee was entitled to a conveyance of the premises free from incumbrances as of May 4, 1891.

**2. SAME—OBLIGATION TO DO EQUITY.**

Plaintiff bought the premises for $22,500, with a limited capital of $6,750 for speculative purposes, paying $2,000 cash. Defendant, when he learned of the assessment, did not offer to return the $2,000, of which he had the use for nearly four months, but demanded that plaintiff should accept a conveyance which would release him (defendant) from liability for the assessment, and, suit being brought for specific performance, persisted in such demand. *Held* that, not having done equity, defendant was not entitled to the relief demanded.

**3. SAME—ACCIDENT—MISTAKE.**

The intervention of the assessment in question, and the dealings of the parties considered with reference thereto, constituted no "mistake of law or fact" nor "accident" entitling defendant, the vendor, to relief.

**4. SAME—INADEQUATE CONSIDERATION—UNCONSCIONABLE BARGAIN.**

The deduction of the amount of the assessment, $1,980.51, from the purchase price of the property, $22,500,—about 8 per cent.,—constituted no such inadequacy of consideration as to shock the conscience, and entitle defendant to relief on that ground.

CLEMENT, C. J., dissenting.

Appeal from special term.

Action by Charles Gotthelf against James S. T. Stranahan to compel specific performance of a contract for the sale of lands. From a judgment for plaintiff, defendant appeals. Affirmed.

The following opinion was delivered by OSBORNE, J., at special term:

"By contract bearing date the 7th day of January, 1891, defendant agreed to sell to plaintiff's assignor a block of ground in the Twelfth ward of this city, bounded by William, Columbia, King, and Dwight streets, and also a plot of land adjacent thereto, bounded in part by King, Dwight, and Bush streets, for the sum of twenty-two thousand five hundred dollars. The sum of two thousand dollars was paid down, and the balance of the purchase money was to be paid in part cash and in part by mortgage, on the execution and delivery of the deed. The sale and purchase was to be closed on February 9, 1891. The contract provided that the 'title [was] to be perfect in fee simple, and free from incumbrance.' At the time this contract was made, Columbia street was the only street adjacent to said premises that was graded and paved. Bush street was graded, and used as a highway, and the other streets named existed only on the city map. On February 9th the time for passing the title was postponed by the attorneys for the respective parties for one week, in order to remove or remedy some objections to title. At the time the contract was made the premises in question were occupied by upwards of thirty 'squatters,' most of whom paid rent to the defendant. About February 10th defendant was notified that plaintiff would require possession of the premises. In order to enable defendant to remove said squatters, the time for passing the title was again adjourned to March 10th, and from March 10th to April 1st, and from April 1st to April 14th, and on April 14th the following stipulation was made by the attorneys for the respective parties: 'The date of carrying out the purchase of the above-described premises is made on or before the ninth day of May, 1891, as though said date had been originally fixed therein for closing said title; and time is now made the essence of this

contract.'   On March 3, 1891, an assessment for $901.12 was levied and became a lien on a portion of said premises for the grading and paving of Bush street; and on April 21, 1891, an assessment for $1,079.33 was levied and became a lien against a portion of said premises for the grading and paving of William street.   These assessments, under the provisions of the city charter, were laid and collectible in advance of said grading and paving.   The parties met pursuant to said last-mentioned adjournment, when the defendant tendered a deed covenanting that the premises were free and clear of all incumbrances on February 9, 1891, the day originally fixed for closing.   Plaintiff refused to accept said deed, claiming that defendant was bound to pay off and discharge the two assessments above mentioned.   This defendant refused to do, whereupon plaintiff brought this action to compel a specific performance of the said contract.   In his answer defendant prays judgment that plaintiff be decreed to specifically perform his contract.

"It will thus be seen that the question in dispute in this action is as to which party is liable to pay said assessments.   I am of the opinion that the effect of the various adjournments of the time to close the title, made at the request of the defendant, and with a view to enable him to give possession of the premises, was the same as if the last-mentioned adjourned day had been originally designated in the contract as the time for the delivery of the deed.   This being so, then defendant, in the performance of his contract to give a deed of the premises free from incumbrance, would be bound to pay and discharge said assessments.   The contention of the learned counsel for the defendant is that to compel defendant to pay off these assessments would work a hardship to him, and bring about results that were not within the intent or understanding of the parties at the time the contract was made, and that in such a case equity will not decree specific performance.   It is very true that the remedy of specific performance is, in a certain degree, discretionary, but that discretion is not an arbitrary or capricious one, depending on the mere pleasure of the court; it is controlled by established doctrines and settled principles.   Specific performance will not be decreed where a party is induced to enter into an unconscionable bargain, or where there is any lack of fairness, even though it cannot be said that the contract is tainted with fraud.   There is no pretense here that the contract, when made, was unconscionable or unfair or tainted with fraud; on the contrary, it was fair and reasonable.   The contention of the defendant substantially is that, if he is compelled to pay the assessments in question, the premises will be to that extent enhanced in value, and thus plaintiff will have the benefit of that enhanced value,—a result not contemplated by the parties when the contract was made.   It is well settled that the happening of events subsequent to the making of the contract, which may have the effect of increasing or diminishing the value of the subject of the contract, and so making it less advantageous to one of the parties, even though unexpected or not contemplated, will not, in equity, be a sufficient ground to refuse specific performance.   True, there have been cases where the courts have refused to decree specific performance where it would work a hardship, but the hardship complained of must be so gross as to shock the conscience.   In my opinion, the enforcement of the contract in question does not work such a gross hardship as to shock the conscience. When a party signs and seals a contract the expectation is that it will be carried out and enforced.   To hold otherwise would substantially put an end to commercial dealings.   The contracting parties must necessarily assume all the risks and liabilities and fluctuations that may arise between the time of making and the time of completing the contract.   *Low* v. *Treadwell*, 12 Me. 441; *Willard* v. *Tayloe*, 8 Wall. 557; *Lawder* v. *Blachford*, Beat. 522; *Lee* v. *Kirby*, 104 Mass. 420; *Addington* v. *McDonnell*, 63 N. C. 389.   *Vide*, also, Wat. Spec. Perf. Con. 165, 173, 174.   Suppose that, by reason of the location of a park in the immediate neighborhood of the premises in question, or the

happening of some similar event, the value thereof had been largely enhanced, the defendant might with equal force contend that it would be inequitable to compel him to convey for $22,500 land that had suddenly and unexpectedly become worth, say, $35,000. On the other hand, suppose that, by the projection of an elevated railroad in front of the premises in question after the making of the contract, their value had been largely diminished, the buyer certainly could not be heard to contend that he should not be compelled to perform his contract by reason thereof. The defendant, if he had seen fit, could have provided in his contract that he was not to be held liable for any assessments levied on the premises subsequent to the making of the contract. It cannot be said that he had no reason to anticipate the levy of any such assessments, or that they were entirely unexpected, for it appears from the testimony of Mr. Johnson, his broker in negotiating the sale, that he (Johnson) told the defendant ' that there was an effort being made to open Bush street and King street, and that there were a great many assessments to be levied there; * * * that he had better sell it,'—referring to the property in question. While the dates of the actual levy of the assessments in question are alone in evidence, the court will take judicial notice of the proceedings required by the charter of the city of Brooklyn to be carried out preliminary to the levy of the assessments, and that the time necessarily consumed in conducting those proceedings carried back the time of inception of proceedings to a period very near, if not anterior to, the date of the contract. When defendant covenanted to give a deed of the premises free from all incumbrance at the time of the delivery of the deed, he must be held to have assumed all the risk of, and all the liability for, all assessments or other liens attaching to the property between the date of the contract and the delivery of the deed. .Had defendant been ready on February 9th to give a clear title, with possession, as covenanted, the assessments now in dispute would not have been brought in question. By defendant's default a delay of three months occurred, and during that time he has had the use of the two thousand dollars paid to him at the signing of the contract, as well as such rents as he has collected from his tenants during that period. Both parties are here demanding specific performance. The plaintiff is without fault, and I think that he is entitled to the relief that he seeks. Plaintiff should have judgment that defendant convey the premises in question free of all incumbrances on the 9th day of May, 1891. The bond and mortgage to be given by plaintiff should also draw interest from that date. Plaintiff should also recover from defendant the costs of the action."

Argued before CLEMENT, C. J., and VAN WYCK, J.

*Geo. G. Dutcher* and *W. C. De Witt*, for appellant.    *G. G. & F. Reynolds*, for respondent.

VAN WYCK, J. . In the division of the labor of our general term this cause was assigned to my learned associate to write the opinion therein. Differing in our conclusions, it devolves upon me to give the reasons for mine in favor of the affirmance of the judgment from which this appeal is taken. The trial court decreed specific performance in favor of the vendee of a contract for the sale of real estate, and the vendor complains of this decision on several grounds, which will be discussed hereafter. The judgment carries with it such weight as will cast upon the appellant the task of showing that it is contrary to the rules of equity. The contract is the ordinary executory agreement dated January 7, 1891. It provides for the sale and purchase of certain city lands, having in view the division thereof by purchaser into many lots of 20 by 100 feet, for $22,500, to be paid as follows, viz.: $2,000 on that date, and the balance on delivery of deed; $4,750 in cash, and $15,750 by mortgage containing a stipulation for the release of each lot from the lien thereof on payment of $400. It further provides that "said sale and purchase shall be

completed  *  *  *  on the 9th of February, 1891," by delivery of the usual deed of warranty conveying the lands, "title to be perfect in fee simple, and free from incumbrance." There being no intimation of want of mental strength or business experience in either of the contracting parties, it must be assumed that both fully understood and appreciated the terms of this simple and plain contract. Both doubtless thought they had made a good bargain. The words of the court in *Seymour* v. *Delancy*, 3 Cow. 533, are not inappropriate: "Every member of this court must be well aware how much property is held by contract; that purchases are constantly made upon speculation; and that the value of real estate is fluctuating; and that there most generally exists an honest difference of opinion in regard to any bargain, as to its being a beneficial one or not. To say, when all is fair, and the parties deal on equal terms, that a court of equity will not interfere" to compel specific performance, on the ground of inadequacy of price, or because the bargain is not a good one for one of the parties, "does not appear to me to be supported by authority." The contract herein discloses that the purchaser, with the relatively small capital of $6,750, bought the lands on speculation, and largely on the credit of seller, expecting to realize a profit by sales, from time to time, of separate lots, which the seller agreed to release from the mortgage lien on partial payments. Assuming that this property was sold for its fair and full value, the refusal to decree specific performance would nullify the whole object and purpose of the purchaser after he had taken the risk of depreciation of the value of the land between the date of contract and the day of passing title. The vendor's broker, before this contract was signed, told him that some assessments had been laid, and many assessments were to .be levied, on this property for improving these streets. Vendor says, in partial contradiction: "I have no recollection of that time. It might pass through my own mind. That is all I could say on the subject. That is all I recollect."

In following the incidents of this transaction it will be well to keep in mind that, after the contract was signed, all communications addressed to vendor were answered through agents. January 9, 1891,—two days after contract was signed,—the defendant's (vendor's) agent, McCormick, wrote to plaintiff's (vendee's) agent, Bailey, that the buildings (some 32 in number) on the premises belong to the tenants, and conveyance should be made subject to their rights. January 10th, vendee's agent, Bailey, wrote to vendor: "If there are tenants on the premises, your contract requires you to remove them, and give possession to vendee." At this time vendor employed an attorney (Dutcher) to attend to removal of tenants. Dutcher visited vendee's attorney, Garrison, two or three days after contract was signed, and asked him if he would accept title with tenants on the lands, and offered to allow $150 for it, giving as a reason therefor that vendor did not want his name connected with the removal of these poor people. The offer was refused, and Dutcher was told $500 would not induce purchaser to accept it. If Dutcher, after this positive refusal, on January 9th or 10th, of Garrison, to accept his offer of $150 to take title subject to possession of tenants, had promptly taken steps to remove them, he could have done so long before the levying of the assessments hereinafter mentioned, which are the sole cause of complaint. Notwithstanding such refusal, Dutcher waited till February 23d to give notice to tenants to quit on or before March 1st, and waited till April 16th to apply to court for a precept to remove them. January 13th,—a day or two after Dutcher had been told the tenants must be removed,—McCormick, another agent of vendor, wrote to vendee's agent, Bailey, that in the negotiation preceding the contract it was understood that, "in the discretion of the purchaser," the tenants were to remain; that the tenants were 30-day tenants, and Dutcher would so testify. Dutcher did not so testify, for on the trial he said, "I was in a good deal of a quandary what they were." These squatters

came and went without consent or contract.   Three days before this letter, Dutcher had been told vendee would not accept title subject to the rights of these squatters.   February 6th, vendee's agent wrote vendor that there were defects of title that would have to be cured, and an adjournment might be necessary.   February 9th, time for completion of sale and purchase was extended to February 16th for curing such defects.   February 10th, vendee's agent, Bailey, wrote vendor's agent, Dutcher, that purchaser insisted upon the removal of squatters.   February 12th, time to complete purchase and sale was extended to March 10th, to enable vendor to give possession.   March 2d, assessment on the premises of $901.13 for grading and paying Bush street was confirmed, and the commencement of the proceedings for the levying thereof must have considerably antedated the day fixed in the contract for the completion of the sale and purchase.   See Brooklyn Charter, (Laws 1888, c. 583, tit. 19, § 2 *et seq.*)   The vendor's remonstrance might have defeated it.   Section 2.   March 6th, Dutcher writes it is slow work to get off squatters, and intimates he will need further indulgence.   March 10th, time for completion of sale and purchase extended to April 1st.   March 30th, time further extended to April 14th.   April 2d, vendee's agent, Bailey, writes to Dutcher, complaining of his delay in removal of squatters.   April 13th, time for completion of sale and purchase was extended to May 9th, with the expressed agreement that it should have the same effect as if it was written in contract originally, instead of February 9th.   April 28th, assessment on premises of $1,079.38, for grading and paving William street from Richards to Columbia street, was confirmed.   What had been said as to probable time of commencement of proceedings and effect of vendor's remonstrance in relation to the other assessment applies to this one also.   These assessments were for improvements to be made, the nonexistence of which could have been observed by a view of the premises at the date of contract.   They became a lien at the respective dates of confirmation,—March 2d and April 28th,—and have a priority over all liens, except those for taxes and water rates.   Charter, (Laws 1888, c. 583, tit. 19, § 36.)   They amount to the sum of $1,980.51, which is about $8\frac{1}{2}$ per cent. of $22,500, the purchase price.   If defendant is required to pay the assessments, he will realize $8\frac{1}{2}$ per cent. less than he would if plaintiff should be compelled to pay the same.

On May 4th vendor tendered deed of warranty, free of incumbrances as of the date of February 9th,—the original date fixed in contract for completion of sale and purchase,—and demanded the balance of cash payment and mortgage.   On May 4th vendee tendered the balance of cash and mortgage, and demanded deed of warranty free from incumbrances as of that date.   The real dispute is that each party insists that the other should assume the burden of these assessments for $1,980.51.   I believe my learned associate and myself are of the same opinion,—that the technical legal effect of this contract obligated the vendor to convey the premises free from incumbrances on May 4th.   Any other construction of the terms thereof would lead to the absurdity that the vendor could have mortgaged, or even sold, the premises between February 9th and May 4th, and then tendered a conveyance of warranty free of incumbrance as of February 9th, in full compliance with his contract.   My associate insists that equity should relieve the vendor from specific performance of his contract according to its strict legal terms, because these assessments were levied between the date originally fixed in the contract and that fixed by subsequent agreement for the completion of the sale and purchase.   I differ from him, and will now give the reasons therefor.   One seeking, through the grace of equity, relief from his legal obligations, should enter the tribunal clothed in the habiliments of equitable conduct in all his relations to the contract and in his actions in the transaction.   He who asks equity must do equity.   This vendor has had $2,000 of the vendee's money since January 7, 1891.   When he learned of these assessments

166 of NEW YORK SUPPLEMENT, vol. 19.

he did not offer it back, and request to be relieved from what he deemed to be an inequitable contract, but he demanded of the vendee the enforcement thereof, minus the asserted objectionable and burdensome terms, tendering a deed to accomplish that purpose. On vendee's refusal to accede to this demand, he retained the $2,000 without any expressed thought of returning the same. It is a reasonable inference that at that time vendee had been stayed from using his energy and limited capital for four months in other enterprises by having his cash tied up in possession of vendor, and being subject to the heavy obligations of the contract which vendor then refused to perform. When an equity court is asked to compel him to make specific performance of his legal obligations, he admits that he still has the money, and reiterates his demand that the vendee be forced to make specific performance of the obligations on his part on the compliance of vendor with his obligations, less those he deems inequitably burdensome, or, if this be denied, then that vendee's complaint be dismissed, without an offer to return the money, and with costs. (See defendant's answer, setting up counterclaim and requests to find.) I agree with the learned trial judge that both vendee and vendor demanded, in court as well as out of court, specific performance of the contract; the former claiming that the day fixed for the completion of the sale and purchase was on or before May 9th, and the latter that the day fixed was February 9th, and that his agent, Dutcher, had no authority to agree to the later date. His authority was not doubted by the trial court.

The policy of equity jurisprudence has ever been to uphold the validity and enforce the specific performance of the legal terms of a written contract between adult parties of sound, contracting mental powers, unless sufficient shall be shown for the reformation, rescission, or nonenforcement of same for fraud, mistake, or accident, or something intimately allied to one of these three grounds of equity's interference. Equity never yearns to make new contracts for such parties in the light of subsequent events which would or might have led one of the parties to make a different and more beneficial contract for himself, or none at all. Chancery has refused, under certain circumstances, to compel specific performance of contracts which it would not reform or rescind for fraud, mistake, or accident, on the ground that the inequity of doing so would shock the conscience, not of the party to the contract, whose judgment might be, and usually is, influenced and warped by the bias of self-interest, but the conscience of an impartial and indifferent person. But, on a critical examination of all the reported authorities bearing on this point, it will be seen that the inequity meant is something closely akin to fraud, mistake, or accident, which is variously characterized in numerous opinions as an unfair, unjust, and unreasonable contract, or as an agreement not free from fraud, misrepresentation, accident, or mistake, or as a hard or unconscionable bargain which would work gross wrong. This vendor can perform his contract, and therefore it will not be necessary to consider the most numerous class of reported cases on specific performance involving the inability to perform. There is not the slightest insinuation of fraud against this vendee, or the suggestion of suspicion that he made any misrepresentation, or was silent in the face of moral duty to speak, which did or might have misled the vendor. There was no mistake of law or fact. The contract was a written one, the terms of which were plain and simple, and well known to both. Neither party had suggested that he did not thoroughly understand them, and I doubt very much if either of them would not deem it a reflection upon his business experience for any one else to make such a suggestion. If the vendor did not bring his mind to the active state of guessing or anticipating the exact date when these assessments would be levied after the making of the contract, this can hardly be raised to the dignity of a mistake of fact. Any owner of Brooklyn real estate, and much more an extensive one, knows of the liability of such levies, not only from the notice that

the law gives, but from its frequent and constant application.  Besides, his attention was called thereto by his broker just before signing the contract, and he says, "It might pass through my own mind."  It is plain that fraud or mistake or their kindred incidents cannot be invoked to relieve this vendor from specific performance of his contract.  Was there such accident as can be successfully relied upon? is alone left for consideration.  The definition of "accident" found in Pomeroy's Equity Jurisprudence (1st Ed. § 823) is in accord with the adjudications of our courts: "Accident is an unforeseen and unexpected event, occurring external to the party affected by it, and of which his own agency is not the proximate cause, whereby, contrary to his own intention and wish, he loses some legal right, or becomes subjected to some legal liability, and another person acquires a corresponding legal right, which it would be a violation of good conscience for the latter person, under the circumstances, to retain."  The party must have "an equity intrinsically superior to that of his adversary, and unaffected by his own negligence or other fault."  Id. § 830.  These assessments can hardly be said to have been unforeseen by this vendor.  He, being a large owner of Brooklyn real estate, a man of large experience and acumen in business and municipal affairs for many years, had the notice that the law (the Brooklyn charter) gave him of the liability of such assessments, as well as the unpaved condition of the street. He had the notice that the law required advertisements of the proceedings to be published in the Brooklyn newspapers of the largest circulation, the notice that his own broker gave him, just before signing this contract, that assessments would be levied, and his own admission that " it might pass through my own mind."  A person of ordinary experience and prudence can hardly claim surprise under such circumstances.  There is no claim that the vendor instigated the proceedings for these assessments, and in that sense his agency was not the proximate cause thereof, but, at best for him, it is an open question whether, with the notice of the liability of the levying of them, and the reasonable expectancy thereof involved therein, and his failure under the circumstances to make at least the effort to prevent the levy by remonstrance, under the charter, (Laws 1888, c. 583, tit. 19, § 2,) he is not chargeable with being the cause thereof as between himself and the vendee, for one assessment was for grading and paving Bush street from Court to Dwight street, a distance of five blocks, and the other William street from Richards to Columbia street, a distance of two blocks; so it is apparent that his remonstrance might probably have defeated them.  The vendor was a witness, and does not intimate in his testimony that he would not have made this exact contract, even if he had positively known, at time contract was made, that these assessments would be levied before the day fixed in contract for completing sale and purchase; and there is no suggestion in any of the evidence that the vendor will not receive the full value of the land, though he be compelled to pay these assessments.  Will the retention of the advantage accruing to the vendee by the legal obligation of vendor to pay these assessments levied before the day fixed by agreement for the completion of sale and purchase be a violation of good conscience under such circumstances?  The vendor's equity must be so intrinsically superior to that of the vendee, and unaffected by his own fault. as to shock the conscience.  Pom. Eq. Jur. (1st Ed.) § 830.  There is not a particle of proof that $22,500 is not a large price for this land,—its full value or more.  Besides, it is a well-known fact that the value of real estate cannot be estimated with such nice exactness as that of the ounce of silver, or standard articles of merchandise, as the barrel of flour or sugar.  It is equally well known that the most expert appraiser of real estate would revel in pride if his estimated values always came within 10 per cent. of the price the land would sell for within a reasonable time, after the utmost diligence directed to that end.  Under the proofs in this case, there is nothing to establish that the vendor would not at least realize the full value of his lands after paying these

assessments. There is no evidence from which a probability can be inferred that he could sell it for $22,500 plus the assessments of $1,980.51. If there is no inadequacy of price, when measured with the true value, caused by the obligation of vendor to pay these assessments, levied after date of contract, then the asserted claim of inadequacy is a mere refinement, and not a substantiality, and the inequity based thereupon, which it is insisted would render specific performance a violation of good conscience, is a fanciful myth. This explains how the bias of self-interest innocently induced this vendor to demand, both out of as well as in court, specific performance of every obligation of vendee on the performance of only those obligations on vendor's part which he, in his judgment, deemed perfectly equitable. This court has no power to make a more beneficial contract for him. The vendee starts out having in his favor the equities that are implied from having the legal rights on his side; also the equities growing out of the incidents to the transaction. He, with a limited capital of $6,750, on January 7th bought lands in wholesale quantity at their full value of $22,500, parting at once with $2,000 of his cash capital, with the disclosed object of commencing on February 9th the retail business of selling it off lot by lot, with the express understanding that, as he did so, the grantor would release each from the lien of the purchase-money mortgage of $17,750 on payment of $400. He is delayed in his enterprise, without his fault, till May 4th, and then by the refusal of vendor to perform. For four months he is tied up by the obligations of his contract, subject to the risk of depreciation, and is deprived of the use, at least, of $2,000 of his cash, and prevented from retailing his lots. It would seem that vendor's alleged equity is not intrinsically so superior to that of the vendee as to shock the conscience. This is true, under the foregoing circumstances, even if it is assumed that the value of the lands could be exactly ascertained, and was, just before the levy of assessments, exactly $22,500. There is no safe presumption that the value of the lands was or will be increased to the extent of the portion of assessment levied upon it for the cost of grading the streets in question. It does not seem that the possibility that these lands may be increased in value by the grading and paving of the streets to the extent of the assessment, which is only $8\frac{1}{2}$ per cent. of the purchase price, creates such inadequacy of consideration as to shock the conscience. I have endeavored in research to examine all the reported authorities of our courts bearing upon this point, and fail to find any in which equity interfered where the inadequacy was less than 33 per cent., and in most of them it was more; and even in these there were some other elements of inequity, such as misrepresentation, or silence in presence of good faith to speak. The following are fair illustrations of the most favorable action of our courts to the contention of this vendor: In *Margraf* v. *Muir*, 57 N. Y. 155, it was held to be a hard and unconscionable bargain where a woman, living at a distance, and unfamiliar with the value, sold to one familiar with it premises worth $2,000 for $800, under circumstances of concealment which pointed to bad faith. In *Post* v. *Leet*, 8 Paige, 336, the increase of price created by the levying of an assessment for the opening and macadamizing between date of contract and date of execution was 33 to 50 per cent. of contract price. The work had been done, and the street had been in use for three years, accompanied with misleading statements or silence of master selling, and a deceiving clause in the terms of sale. In *Smith* v. *McCluskey*, 45 Barb. 610–613, the chief consideration was the house, and it had been burned down. In *Fitzpatrick* v. *Dorland*, 27 Hun, 291, specific performance had been prevented, without vendor's fault, for 14 years, and the property had greatly increased in value, and was heavily burdened with taxes and assessments, which, it seems, would have eaten up the purchase price.

No reference is made in the printed points to the exception taken at folio 164 to the exclusion of testimony offered to show that in the negotiations pre-

ceding the making of the written contract there was some talk or understanding that vendee would accept transfer subject to the rights of tenants and squatters to occupation. On the oral argument appellant's counsel informed this court that the ruling was not error. That it was not harmful error I agree with him. It was not included in the written agreement, and there is no contention that by mistake or fraud it was not so included, or that vendor did not know it was not so included. Besides, in McCormick's letter of January 13th, written by the authority and direction of vendor, he states that the understanding referred to was that the 30-day tenants were to remain, "in the discretion of purchaser," who exercised his discretion promptly on the 9th or 10th of January, to require vendor to perform this contract in giving possession, and vendor admitted and accepted his duty in this respect at once, and must have employed Dutcher several days before to attend to the removing of the so-called "tenants," some of whom were not tenants at all. Besides, such informal talk or understanding in the negotiations preceding the execution of a written contract, plain and simple in its terms, and understood and appreciated by both parties, will not magnify the alleged inequity sufficiently to make the agreement so hard and unconscionable as to violate good faith and conscience. If the vendor pays these assessments, he will receive the amounts back in case they are canceled. Brooklyn Charter, tit. 19, § 11. It should not be forgotten that the general belief entertained by each contracting party in agreements of sale that he has made a good bargain is the life of trade, and that the rule of *caveat emptor* forbids equity from interfering with the advantages of the fortunate one unless the good fortune is acquired through means which shock good conscience. 1 Washb. Real Prop. (4th Ed.) p. 545. The judgment must be affirmed, with costs.

CLEMENT, C. J., (*dissenting*.) On the 7th day of January, 1891, the appellant agreed in writing to sell to one Robinson a large plot of land located in the Twelfth ward of this city, for the price of $22,500, and the deed was to be delivered on February 9, 1891. Subsequently Robinson assigned his interest in the contract to the respondent. At the date of the execution of the contract—January 7th—there were on said premises 32 buildings, owned by the occupants, who came and went without permission of the owner. Before the time fixed for closing, counsel who examined the title requested an adjournment to February 16th, to verify certain papers, which extension was agreed to. On February 10th said counsel notified the defendant that he would be required to remove the tenants from the premises. The defendant on February 12th employed George G. Dutcher as his attorney for the sole purpose of removing the tenants, and during such removals to consent to the adjournment of passing the title. On February 12th Mr. Dutcher, on behalf of the defendant, requested an extension of the contract, and by consent the closing was postponed to March 10th. On that day the squatters had not been removed, and another extension was given to defendant till April 13th. At that time Mr. Dutcher applied for a further extension, and counsel for the respective parties indorsed on the contract as follows: "The date of carrying out the purchase of above-described premises is made on or before the 9th day of May, 1891, as though said day had been originally fixed therein for closing said title, and time is now made the essence of the contract." I now quote *verbatim* the tenth and eleventh findings of fact: "*Tenth.* The real and true meaning of the stipulation of April 13, 1891, between attorneys Garrison and Dutcher, in the minds of the parties thereto, was solely to provide peremptorily against any further postponement than that therein named, and that neither of said parties intended by said stipulation that said contract should be altered or enlarged thereby. *Eleventh.* That all the postponements, except the first, were for the purpose of enabling defendant to re-

move the tenants or squatters, and the said postponements were by mutual consent." The attorney for defendant commenced to dispossess the squatters about February 12th, and proceeded with diligence, and on May 4th all were removed from the premises. On January 9th the land in question was open and not fenced. Bush street was not paved, but had been used for vehicles for eight or ten years. "William street was very largely water." Columbia street is graded and paved. On March 3d an assessment of $901.12 was levied on said premises for the grading and paving of Bush street, and on April 28th an assessment for $1,079.33 was confirmed for the grading and paving of William street; but down to the date of trial—December, 1891— nothing had been done by the city towards the grading and paving of either street. The defendant did not, nor did either of the attorneys, have any knowledge on April 13th that an assessment had been levied. On May 4th the defendant tendered plaintiff a deed with covenants that the premises were free and clear of incumbrances on February 9th. The plaintiff demanded a deed with covenants against incumbrances to May 4th. The plaintiff refused to accept the tender of defendant on the sole ground that the defendant was obliged to pay the assessments for grading and paving Bush and William streets. The foregoing statement of facts is taken from the decision in the record.

The learned trial judge found as conclusion of law that the defendant should specifically perform his contract, and should pay the two assessments as claimed by plaintiff. In the opinion at special term it is stated that both parties asked specific performance. I do not so understand from the record. It is true that in the prayer for relief in the answer the defendant asked that the equities between the parties should be adjusted as of February 9th, and that the plaintiff be decreed to specifically perform his contract; but it is also true that, in addition, he asked that he have such other or further relief as equity and good conscience, and the circumstances of the case, required, and which to the court should seem meet and proper. I regard the prayer for relief in an action in equity as of little consequence when such action is litigated. The requests to find are controlling, and in his requests the counsel for defendant did not ask a specific performance. This is an action in equity, and the court may and should go behind the letter of the agreement, and do what is just and fair between the parties. The case comes down to this single question: Is it equitable that the defendant should pay the two assessments, amounting to about the sum of $2,000? The date of the contract of sale was January 7, 1891, and the deed was to be delivered on February 9th. The assessment for grading and paving Bush street was confirmed March 3d, and the like assessment on William street became a lien on April 28th. Assessments in this city are levied in advance, and in December last neither Bush nor William street had been paved. On the facts, as found, it appears that the parties did not know that the assessment on Bush street was a lien when the contract was extended, and the assessment on William street was not levied until after the last extension. If the assessments had been laid for improvements which had been completed or were in progress, then the defendant clearly should pay them. *Lathers* v. *Keogh*, 109 N. Y. 583, 590, 17 N. E. Rep. 131. The closing of the contract was postponed for the sole purpose of giving the defendant time to remove the tenants. In equity it was postponed for no other purpose. If so, I do not think that the plaintiff should derive any other benefit than what was mutually intended by the parties. The assignor of the plaintiff purchased the premises on January 7th, when the contract was made, and the purchase price was fixed at that time at the sum of $22,500. Bush street was then passable for vehicles, but was not paved, and William street could only be navigated by boats. The plaintiff did not have in view that the assessments would be confirmed before February 9th. If the defendant pays the assessments, then, in effect, Bush and William

streets were graded and paved when the contract was made, on January 7th. In a court of equity the time of sale of real property is when the contract is made, and not when the conveyance is delivered in pursuance of the contract. *Simmons* v. *Cloonan*, 47 N. Y. 1, 13, 81 N. Y. 557. If the defendant had contracted to sell the lots after the assessments were levied, and the purchaser had knowledge of the fact, then a different question would have been presented, and perhaps, if the assessments had been levied between January 7th and February 9th, the defendant might be held liable to pay the same, though I should be inclined to hold the opposite view. The assessments were the act of the city, in which neither plaintiff nor defendant participated or had any knowledge. A case might arise where lots are sold, and, pending the contract, assessments could be levied up to one half their assessed valuation, (the limit fixed by the charter,) for future improvements. Would a court of equity compel the specific performance of the contract? The plaintiff is not injured if he takes the lots and pays the assessments in question, for the value of the lots, as he purchased them, is enhanced by the amount of the assessments, or, if he declines to take title, the court, on a new trial, can award him damages which will be full compensation for his loss. In this action it has been decreed that the defendant perform a contract which in its effect was never intended to be made by either party. It seems to me to be a clear case of mistake. As I understand the authorities, in an action where specific performance is sought the defendant may always show that there was a mistake, even though such mistake was not mutual; and, if the evidence is clear, and the plaintiff has not suffered thereby, performance will be denied, unless there is gross carelessness on the part of the defendant. The authorities on this question are collated in Pomeroy's Equity Jurisprudence, (section 860,) and I quote from that work: "A court of equity will not grant its affirmative remedy to compel the defendant to perform a contract which he did not make, or which he would not have entered into had its true effect been understood." "A mistake which is entirely the defendant's own, or that of his agent, and for which the plaintiff is not directly or indirectly responsible, may be proved in defense, and may defeat a specific performance." Parol testimony is admitted in behalf of a defendant, not for the purpose of contradicting or modifying a written agreement, but to defeat the equity of plaintiff. This rule is well settled by the text-books and authorities. 1 Sugd. Vend. 160; Pom. Eq. Jur. (1st Ed.) § 860; *Best* v. *Stow*, 2 Sandf. Ch. 298; *Stevens* v. *Cooper*, 1 Johns. Ch. 425, 429; *Harris* v. *Pepperell*, L. R. 5 Eq. 1; *Martin* v. *Pycroft*, 2 De Gex, M. & G. 785. It is claimed that the defendant must pay the assessments because the contract of sale so requires, but it clearly appears that the defendant did not so intend, and that the plaintiff never so expected, when the contract was made, or when the extensions were given. The case of *Post* v. *Leet*, 8 Paige, 336, seems to me to be directly in point on the question involved in this case. See, also, *Dowdney* v. *Mayor*, 54 N. Y. 186.

At folios 164 and 165, there are three exceptions to the refusal to admit testimony whereby the defendant sought to show that at the making of the contract there was a verbal understanding between the assignor of plaintiff and the defendant that the tenants should remain. In my opinion, the testimony should have been admitted on the authorities before cited, though I prefer to put my conclusion on no technicality, but on the ground that on the entire case specific performance should be denied to the plaintiff for want of equity. The judgment appealed from should be reversed, and a new trial granted, with costs to appellant to abide this event.